UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION

UNITED STATES OF AMERICA,   )
      Plaintiff,         )
                      )    Case No. 1:15-cr-00283
      vs.              )
                      )    <u>EMERGENCY MOTION</u>
CURTIS WALDRON,        )
      Defendant.     )

FILED
HARRISBURG, PA

MAY 05 2020

PER _____
             DEPUTY CLERK

MOTION FOR SENTENCE REDUCTION
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)
BASED ON EXTRAORDINARY AND COMPELLING
REASONS RELATED TO UNPRECEDENTED
COVID-19 VIRUS PANDEMIC

Curtis Waldron, Defendant pro se ("Waldron"), moves for a reduction in sentence pursuant to the jurisdiction provided under 18 U.S.C. § 3582(c)(1)(A)(i). Waldron relies upon the unprecedented and devastating worldwide conditions surrounding the COVID-19 pandemic. These conditions are the epitome of "extraordinary and compelling" reasons warranting such relief.

<u>STATEMENT OF FACTS</u>

Waldron submits the following relevant facts for consideration in support thereof:

1.    Waldron was sentenced on March 30, 2017, to 151 months in prison for a violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B): Conspiracy to Possess with Intent to Distribute Heroin, Marijuana, and Cocain.

2.    Waldron has been in custody since November 6, 2015, and is scheduled to be released on October 21, 2026, without consideration of further credits under the First Step Act.

(1)

FILED
15-CR-283 HARRISBURG, PA

## MEMORANDUM IN SUPPORT

MAY 05 2020

PER _____

DEPUTY CLERK

### I.   Jurisdiction.

18 U.S.C. § 3582(c)(1)(A)(i) provides courts jurisdiction to reduce federal sentences imposed by them by motion of either the Federal Bureau of Prisons ("BOP" or "Bureau") or the defendant if the Bureau fails to respond to the defendant's request to his Warden within thirty days.  See The First Step Act, § 603(b), 132 Stat. 5194, 5239 (Codified at 18 U.S.C. § 3582(c)(1)(A)); also United States v. Sotelo, 2019 U.S. Dist. LEXIS 135051 (E.D. Penn. 2019).

Waldron submits a request was made on his behalf to Warden Garrido requesting the BOP file a motion to the Court for a reduction in his sentence based on the extraordinary and compelling reasons surrounding the COVID-19 virus, on March 1, 2020.  The letter, sent by certified-mail, was received on March 5, 2020.  [See Exhibit 1].  It has now been thirty days, and no response has been received from the Warden, thus, this motion is properly before the Court for consideration.

### II.  Extraordinary and Compelling Reasons.

Courts are given broad discretion in terms of what facts may give rise to "extraordinary and compelling" reasons under 18 U.S.C. § 3582(c)(1)(A).  See United States v. Maumau, No. 2:08-cr-00758-NC-11 (S.D. Utah, Feb. 2020).  The present spread of COVID-19 across the entire globe has generated an unprecedented situation deemed "extraordinary and compelling" to warrant relief sought by similarly situated defendants in cases across the United

(2)

States. It is only a matter of time before this extremely contagious virus enters the prison population where Waldron is confined. There has already been outbreaks in a plethora of prisons within the BOP and numerous deaths of inmates have resulted therefrom.

The BOP's low-security prisons are generally built, as is F.C.I. Beaumont Low where Waldron is confined, with open-dormitory housing units. Over 140 inmates are housed in one large room, a veritable Petri dish for the spread of COVID-19 and its deadly symptoms for inmates such as Waldron who have under-lying respiratory and cardiovascular health issues. Waldron suffers high blood pressure, hypertension, and sleep apnea and has a body mass index over 30 and is of African American descent, all deadly factors for those infected with COVID-19. Moreover, Waldron is prescribed Humira, which lowers his immune system making him highly susceptible to infection from COVID-19.

Waldron asserts this situation is the exact sort of "extraordinary and compelling" reason envisioned by Congress in crafting this sentence reduction mechanism.

### III. Compelling Reasons to Reduce Waldron's Sentence.

When reviewing a motion for reduction of a sentence under the provisions of 3582(c)(1)(A), a court should consider the relevant sentencing factors of 18 U.S.C. § 3553(a). Waldron sumits several of these factors support a reduction in his sentence and asks the Court consider the following information it its expeditious determination of this emergency motion.

(3)

18 U.S.C. § 3553(a)(1): The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.

Waldron took responsibility for his involvement in this low-level, non-violent drug offense. Waldron's conduct was such that his sentence, without his status as a career offender based on two prior low-level, non-violent drug offenses, would have been under five years in prison. It is important to note that Waldron has never had any violent offense.

Despite being confined in the worst prison in the BOP, a gang-infested and oft violent prison known by inmates and staff alike as "Bloody Beaumont," an environment conducive to multiple disciplinary infractions every year, Waldron has had only three minor disciplinary infractions in over four years in prison. He has also completed multiple programs offered by the BOP aimed at reducing recidivism and maximizing the success of reentry upon release.  [See Exhibit 2].

Waldron submits his post-sentencing conduct is the most-likely indicator of his propensity to succeed after his release from prison as a productive and law-abiding member of his community.  Waldron will release to the loving home of his family and has solid plans for obtaining gainful employment upon his release.

§ 3553(a)(2): The Need for the Sentence Imposed.

This second sentencing factor is often referred to as the "parsimony clause," which requires the sentence imposed fit the crime in order to maintain the public's confidence in and the

(4)

integrity of our courts.  In short, the sentence imposed must be sufficient, but not greater than necessary, to achieve the goals of sentencing: retribution, deterrence, and rehabilitation.

In the federal system, a 151-month term of imprisonment equates to roughly 129 months served in prison after credit for good conduct time.  Waldron has served 53 months toward service of his sentence.  Under the provisions of the First Step Act of 2018 ("FSA"), federal inmates may earn credits toward service of their sentence for productive use of their time.  These credits will likely result in early release from prison to home confinement in less than two years.  Such release would effectuate a lengthy period of home confinement for some three and a half years.  [Waldron is eligible for completion of the Residential Drug Abuse Program, which would credit one year toward service of his sentence and provide an additional 24 months of home confinement].  Accordingly, a reduction in Waldron's sentence to time served with a mandatory period of home confinement equal to that he would have otherwise received would effectuate substantially the same sentence as originally imposed.  But such modification of his sentence would also eliminate the extreme risk of death upon exposure of COVID-19 were he forced to remain in prison.

## CONCLUSION

Waldron is not asking the Court to turn a blind eye to his crime, nor is he attempting to do so.  Waldron is merely seeking the Court's compassionate consideration of this unprecedented situation and relief therefrom.

(5)

E°X°H°I°B°I°T   1

Terrence M. Brown
Reg. No. 08524-031
Federal Correctional Complex
F.C.I. - Low
P.O. Box 26020
Beaumont, Texas 77720-2602

March 1, 2020

Mr. F.J. Garrido
Warden
F.C.I. Beaumont Low
P.O. Box 26025
Beaumont, Texas 77720        7018 3090 0002 1262 6380

Re: Request for Compassionate Release
    Under 18 U.S.C. § 3582(c)(1)(A)(i)
    Based on Extraordinary and Compelling
    Reasons Surrounding COVID-19

Dear Warden Garrido:

    On behalf of myself and similarly situated inmates at this institution,
I am requesting your recommendation to the Director for a motion to our
sentencing courts for a reduction in our sentences based on the extradordinary
and unprecedented pandemic related to COVID-19.

    I respectfully ask you to identify all inmates near 50 years of age, who
have a pre-existing medical condition (i.e., high blood pressure, asthma,
chronic bronchitis, or diabetes), who are serving sentences for non-violent
crimes and have served a substantial portion of their sentences, and to
recommend to the Director that a motion to each of their sentencing courts be
made to reduce their sentences to time served and to order their immediate
release from prison.

    I fully understand that such an extreme gesture of compassion from a
prison warden is unusual, but this is an extremely unusual time in our world
history that warrants such action.

    Thank you in advance for your time, attention, and forthcoming reply.

Respectfully,

Terrence M. Brown

Terrence M. Brown

cc: file



## Individualized Reentry Plan - Program Review  (File copy)

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: WALDRON, CURTIS  14280-067

SEQUENCE: 01411336
Team Date: 12-11-2019



| | |
|---|---|
| Facility: | BML  BEAUMONT LOW FCI |
| Name: | WALDRON, CURTIS |
| Register No.: | 14280-067 |
| Age: | 44 |
| Date of Birth: | 09-06-1975 |
| Proj. Rel. Date: | 10-21-2026 |
| Proj. Rel. Method: | GCT REL |

| | |
|---|---|
| DNA Status: | ELK03241 / 11-03-2009 |
| CIMS Status: | YES |
| CIMS Reconciled: | YES |

### Contact Information

**Release contact & address**
ROXANN  TADEMY, FIANCEE
5549 GENOA, DENVER, CO 80249 US
phone (home) : (303)243-2082

**Emergency contact #1**
ROXANN  TADEMY, FIANCEE
5549 GENOA, DENVER, CO 80249 US
phone (home) : (303)243-2082

**Inmate is subject to 18 U.S.C. 4042(B) Notification:**   Yes
    CURRENT CONVICTION FOR A DRUG TRAFFICKING OFFENSE

**Inmate is subject to 18 U.S.C. 4042(C) Notification and Registration:**   N/A

### Offense Sentences

| Charge | Terms In Effect |
|---|---|
| 21:841(A)(1);DISTRIBUTION AND POSSESSION WITH INTENT TO DISTRIBUTE HEROIN, MARIJUANA, AND COCAINE (CT-2) | 151 MONTHS |
| 21:841(A)(1) POSSESSION WITH INTENT TO DISTRIBUTE COCAINE BASE AND COCAINE. (CT-1S)   ***SRT VIOLATOR | 24 MONTHS |
| 18:751(A) ESCAPE FROM COMMUNITY CORRECTIONS CENTER ***SRT VIOLATOR | 24 MONTHS |

### Detainers

| Detaining Agency | Remarks |
|---|---|
| *NO DETAINER* | |

### Pending Charges

| |
|---|
| PC:PWIT DELVR;POSS INSTR OF CRM |

### Current CMA Assignments

| Assignment | Description | Start |
|---|---|---|
| BIR CERT N | BIRTH CERTIFICATE - NO | 07-10-2018 |
| DEPEND N | DEPENDENTS UNDER 21 - NO | 07-10-2018 |
| PHOTO ID N | PHOTO ID - NO | 07-10-2018 |
| RPP NEEDS | RELEASE PREP PGM NEEDS | 04-27-2017 |
| SSN CARD Y | SOCIAL SECURITY CARD - YES | 07-10-2018 |
| VET P/S N | PARENT/SPOUSE VETERAN - NO | 07-10-2018 |
| VETERAN N | VETERAN - NO | 07-10-2018 |
| V94 CDA913 | V94 CURR DRG TRAF ON/AFT 91394 | 03-23-2009 |
| WA NO HIST | NO WALSH ACT OFFENSE HISTORY | 03-05-2009 |

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BML | KITCHEN AM | KITCHEN AM SHIFT | 12-16-2019 |

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BML | ESL HAS | ENGLISH PROFICIENT | 04-12-2009 |
| BML | GED HAS | COMPLETED GED OR HS DIPLOMA | 06-25-2009 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| *NO COURSES* | | | | |

### Discipline History (Last 6 months)



**Individualized Reentry Plan - Program Review  (File copy)**

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: WALDRON, CURTIS  14280-067

SEQUENCE: 01411336
Team Date: 12-11-2019

| Hearing Date | Prohibited Acts |
|---|---|
| 07-25-2019 | 306 : REFUSING WORK/PGM ASSIGNMENT |

## ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|---|---|---|---|---|
| BML | A-DES | TRANSFER RECEIVED | 12-03-2019 | CURRENT |
| FTD GP | A-DES | OTHER AUTH ABSENCE RETURN | 04-16-2019 | 10-02-2019 |
| FTD GP | A-DES | OTHER AUTH ABSENCE RETURN | 09-05-2018 | 04-16-2019 |
| FTD GP | A-DES | TRANSFER RECEIVED | 01-03-2018 | 09-05-2018 |
| SCH | A-DES | US DISTRICT COURT COMMITMENT | 04-24-2017 | 12-26-2017 |

## Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 12-29-2011 |
| CARE2 | STABLE, CHRONIC CARE | 05-21-2018 |

## Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| ATH RESTR | NO SPORTS/NO WEIGHT LIFTING | 05-22-2017 |
| NO PAPER | NO PAPER MEDICAL RECORD | 12-03-2019 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 01-16-2019 |
| YES F/S | CLEARED FOR FOOD SERVICE | 11-01-2018 |

## Current PTP Assignments

| Assignment | Description | Start |
|---|---|---|
| NO ASSIGNMENTS | | |

## Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| DAP DIAG | DRUG ABUSE DIAGNOSIS PENDING | 01-10-2018 |
| ED COMP | DRUG EDUCATION COMPLETE | 02-22-2018 |
| NR WAIT | NRES DRUG TMT WAITING | 05-17-2017 |

## FRP Details

| Most Recent Payment Plan |
|---|

**FRP Assignment:**     **COMPLT**    **FINANC RESP-COMPLETED**        **Start: 06-20-2012**

Inmate Decision:    **AGREED**        **$25.00**        Frequency: **MONTHLY**
Payments past 6 months:        **$0.00**        Obligation Balance: **$0.00**

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 2 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |

**Payment Details**

Trust Fund Deposits - Past 6 months:   $605.00            Payments commensurate ?   Y
New Payment Plan:        ** No data **

## Progress since last review

INMATE WALDRON IS NEW AT BML.  THE UNIT TEAM WILL RECOMMEND ENROLLMENT IN RELEASE PLANNING PREPARATION, ACE, VT, AND PARENTING COURSES.  THIS WILL ASSIST THE INMATE IN HIS TRANSITION FROM CUSTODY TO THE COMMUNITY.

## Next Program Review Goals

ENROLL IN PERSONAL FINANCE, HVAC, PARENTING, AND EMPLOYMENT SKILLS BY YOUR NEXT REVIEW.

## Long Term Goals

COMPLETE PERSONAL FINANCE, HVAC, PARENTING, AND EMPLOYMENT SKILLS BY 12-21-2020.

## RRC/HC Placement



**Individualized Reentry Plan - Program Review  (File copy)**

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: WALDRON, CURTIS  14280-067

SEQUENCE: 01411336

Team Date: 12-11-2019

**Comments**

407/408 reviewed and current.
Judicial Recommendations: Yes.
POINTS:  13
NEXT BP338 UPDATE:  07-29-2020
NEXT PROGRAM REVIEW:  06-14-2020

THE UNIT TEAM RECOMMENDED ENROLLMENT IN THE FOLLOWING COURSES:  PERSONAL FINANCE, HVAC, PARENTING, AND EMPLOYMENT SKILLS.

INMATE WALDRON INQUIRED ABOUT A 313 TRANSFER TO A FACILITY NEAR DENVER, COLORADO.  HE WAS ADVISED HE MUST BE AT THIS INSTITUTION FOR A MINIMUM OF 18 MONTHS, DUE TO BEING TRANSFERRED TO BEAUMONT, VIA 323 TRANSFER.  INMATE WALDRON ASKED COULD HE WORK TWO JOBS.  HE WAS ADVISED TO CONSULT WITH A COUNSELOR.



**Individualized Reentry Plan - Program Review  (File copy)**          SEQUENCE: 01411336
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: WALDRON, CURTIS  14280-067                        Team Date: 12-11-2019

|  |  |  |  |
|---|---|---|---|
| Name: | WALDRON, CURTIS | DNA Status: | ELK03241 / 11-03-2009 |
| Register No.: | 14280-067 | | |
| Age: | 44 | | |
| Date of Birth: | 09-06-1975 | | |

_____
Inmate   (WALDRON, CURTIS. Register No.: 14280-067)

_____
Date

_____          _____
Unit Manager / Chairperson                          Case Manager

_____          _____
Date                                                Date



## Individualized Reentry Plan - Program Review  (File copy)

**Dept. of Justice / Federal Bureau of Prisons**
Plan is for inmate: WALDRON, CURTIS  14280-067

SEQUENCE: 01411336
Team Date: 12-11-2019



| | |
|---|---|
| Facility: | BML  BEAUMONT LOW FCI |
| Name: | WALDRON, CURTIS |
| Register No.: | 14280-067 |
| Age: | 44 |
| Date of Birth: | 09-06-1975 |
| Proj. Rel. Date: | 10-21-2026 |
| Proj. Rel. Method: | GCT REL |

| | |
|---|---|
| DNA Status: | ELK03241 / 11-03-2009 |
| CIMS Status: | YES |
| CIMS Reconciled: | YES |

### Contact Information

**Release contact & address**
ROXANN  TADEMY, FIANCEE
5549 GENOA, DENVER, CO 80249 US
phone (home) : (303)243-2082

**Emergency contact #1**
ROXANN  TADEMY, FIANCEE
5549 GENOA, DENVER, CO 80249 US
phone (home) : (303)243-2082

**Inmate is subject to 18 U.S.C. 4042(B) Notification:**                                    Yes

CURRENT CONVICTION FOR A DRUG TRAFFICKING OFFENSE

**Inmate is subject to 18 U.S.C. 4042(C) Notification and Registration:**          N/A

### Offense Sentences

| Charge | Terms In Effect |
|---|---|
| 21:841(A)(1);DISTRIBUTION AND POSSESSION WITH INTENT TO DISTRIBUTE HEROIN, MARIJUANA, AND COCAINE (CT-2) | 151 MONTHS |
| 21:841(A)(1) POSSESSION WITH INTENT TO DISTRIBUTE COCAINE BASE AND COCAINE. (CT-1S)   ***SRT VIOLATOR | 24 MONTHS |
| 18:751(A) ESCAPE FROM COMMUNITY CORRECTIONS CENTER ***SRT VIOLATOR | 24 MONTHS |

### Detainers

| Detaining Agency | Remarks |
|---|---|
| *NO DETAINER* | |

### Pending Charges

| |
|---|
| PC:PWIT DELVR;POSS INSTR OF CRM |

### Current CMA Assignments

| Assignment | Description | Start |
|---|---|---|
| BIR CERT N | BIRTH CERTIFICATE - NO | 07-10-2018 |
| DEPEND N | DEPENDENTS UNDER 21 - NO | 07-10-2018 |
| PHOTO ID N | PHOTO ID - NO | 07-10-2018 |
| RPP NEEDS | RELEASE PREP PGM NEEDS | 04-27-2017 |
| SSN CARD Y | SOCIAL SECURITY CARD - YES | 07-10-2018 |
| VET P/S N | PARENT/SPOUSE VETERAN - NO | 07-10-2018 |
| VETERAN N | VETERAN - NO | 07-10-2018 |
| V94 CDA913 | V94 CURR DRG TRAF ON/AFT 91394 | 03-23-2009 |
| WA NO HIST | NO WALSH ACT OFFENSE HISTORY | 03-05-2009 |

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BML | KITCHEN AM | KITCHEN AM SHIFT | 12-16-2019 |

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| BML | ESL HAS | ENGLISH PROFICIENT | 04-12-2009 |
| BML | GED HAS | COMPLETED GED OR HS DIPLOMA | 06-25-2009 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| *NO COURSES* | | | | |

### Discipline History (Last 6 months)



## Individualized Reentry Plan - Program Review   (File copy)

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: WALDRON, CURTIS   14280-067

SEQUENCE: 01411336
Team Date: 12-11-2019

| Hearing Date | Prohibited Acts |
|---|---|
| 07-25-2019 | 306 : REFUSING WORK/PGM ASSIGNMENT |

### ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|---|---|---|---|---|
| BML | A-DES | TRANSFER RECEIVED | 12-03-2019 | CURRENT |
| FTD GP | A-DES | OTHER AUTH ABSENCE RETURN | 04-16-2019 | 10-02-2019 |
| FTD GP | A-DES | OTHER AUTH ABSENCE RETURN | 09-05-2018 | 04-16-2019 |
| FTD GP | A-DES | TRANSFER RECEIVED | 01-03-2018 | 09-05-2018 |
| SCH | A-DES | US DISTRICT COURT COMMITMENT | 04-24-2017 | 12-26-2017 |

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 12-29-2011 |
| CARE2 | STABLE, CHRONIC CARE | 05-21-2018 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| ATH RESTR | NO SPORTS/NO WEIGHT LIFTING | 05-22-2017 |
| NO PAPER | NO PAPER MEDICAL RECORD | 12-03-2019 |
| REG DUTY | NO MEDICAL RESTR--REGULAR DUTY | 01-16-2019 |
| YES F/S | CLEARED FOR FOOD SERVICE | 11-01-2018 |

### Current PTP Assignments

| Assignment | Description | Start |
|---|---|---|
| NO ASSIGNMENTS | | |

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| DAP DIAG | DRUG ABUSE DIAGNOSIS PENDING | 01-10-2018 |
| ED COMP | DRUG EDUCATION COMPLETE | 02-22-2018 |
| NR WAIT | NRES DRUG TMT WAITING | 05-17-2017 |

### FRP Details

| Most Recent Payment Plan |
|---|

**FRP Assignment:**   **COMPLT**   **FINANC RESP-COMPLETED**      **Start: 06-20-2012**

Inmate Decision:   **AGREED**      **$25.00**      Frequency: **MONTHLY**

Payments past 6 months:   **$0.00**      Obligation Balance: **$0.00**

#### Financial Obligations

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 2 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |

#### Payment Details

Trust Fund Deposits - Past 6 months:   $605.00         Payments commensurate ?   Y

New Payment Plan: | ** No data ** |

### Progress since last review

INMATE WALDRON IS NEW AT BML.  THE UNIT TEAM WILL RECOMMEND ENROLLMENT IN RELEASE PLANNING PREPARATION, ACE, VT, AND PARENTING COURSES.  THIS WILL ASSIST THE INMATE IN HIS TRANSITION FROM CUSTODY TO THE COMMUNITY.

### Next Program Review Goals

ENROLL IN PERSONAL FINANCE, HVAC, PARENTING, AND EMPLOYMENT SKILLS BY YOUR NEXT REVIEW.

### Long Term Goals

COMPLETE PERSONAL FINANCE, HVAC, PARENTING, AND EMPLOYMENT SKILLS BY 12-21-2020.

### RRC/HC Placement



**Individualized Reentry Plan - Program Review  (File copy)**

Dept. of Justice / Federal Bureau of Prisons

Plan is for inmate: WALDRON, CURTIS  14280-067

SEQUENCE: 01411336

Team Date: 12-11-2019

| Comments |
| --- |

407/408 reviewed and current.
Judicial Recommendations: Yes.
POINTS:  13
NEXT BP338 UPDATE:  07-29-2020
NEXT PROGRAM REVIEW:  06-14-2020

THE UNIT TEAM RECOMMENDED ENROLLMENT IN THE FOLLOWING COURSES:  PERSONAL FINANCE, HVAC, PARENTING, AND EMPLOYMENT SKILLS.

INMATE WALDRON INQUIRED ABOUT A 313 TRANSFER TO A FACILITY NEAR DENVER, COLORADO.  HE WAS ADVISED HE MUST BE AT THIS INSTITUTION FOR A MINIMUM OF 18 MONTHS, DUE TO BEING TRANSFERRED TO BEAUMONT, VIA 323 TRANSFER.  INMATE WALDRON ASKED COULD HE WORK TWO JOBS.  HE WAS ADVISED TO CONSULT WITH A COUNSELOR.



**Individualized Reentry Plan - Program Review  (File copy)**
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: WALDRON, CURTIS  14280-067

SEQUENCE: 01411336
Team Date: 12-11-2019

Name:  WALDRON, CURTIS          DNA Status:  ELK03241 / 11-03-2009
Register No.:  14280-067
Age:  44
Date of Birth:  09-06-1975

Inmate   (WALDRON, CURTIS. Register No.: 14280-067)

12/21/19
Date

Unit Manager / Chairperson

12-24-9
Date

Case Manager

12-21-19
Date

# Certificate of Achievement

## This certifies that

Curtis Waldron
Reg.# 14280-067

### has satisfactorily completed

Stress Management

Consisting of 12 hours of Training

This certificate is hereby issued this  10th  day of  Mar , 2020

Psychology Services Department
Federal Corrections Complex (Low)
Beaumont, Texas 77720

_Gardner, A._
_Secretary, Psychology Services_



# Office of the Attorney General
## Washington, D. C. 20530

March 26, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS

FROM:          THE ATTORNEY GENERAL

SUBJECT:       Prioritization of Home Confinement As Appropriate in Response to
               COVID-19 Pandemic

Thank you for your tremendous service to our nation during the present crisis. The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times. We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe. At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities. I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

## I.   TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH

One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances. I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

Exhibit C

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II.   PROTECTING THE PUBLIC

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public. That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways. I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public. I thank you for your service to the country and assistance in implementing this Memorandum.

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.



Office of the Attorney General
Washington, D. C. 20530

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:        THE ATTORNEY GENERAL

SUBJECT:     Increasing Use of Home Confinement at Institutions Most Affected by
             COVID-19

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

I.    IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.   PROTECTING THE PUBLIC

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

```
----------------------------------  x
                                     :
                                     :
                                     :
                                     :
APPLICATION FOR RELEASE FROM         :   AFFIDAVIT OF BRIE WILLIAMS,
CUSTODY                              :   M.D.
                                     :
                                     :
                                     :
                                     :
                                     :
----------------------------------  X
```

I, Brie Williams, hereby affirm as follows:

1.      I am a doctor duly licensed to practice medicine in the State of California.

2.      I am currently a Professor of Medicine at the University of California, San Francisco ("UCSF") in the Geriatrics Division, Director of UCSF's Amend: Changing Correctional Culture Program, as well as Director of UCSF's Criminal Justice & Health Program. In that capacity, my clinical research has focused on improved responses to disability, cognitive impairment, and symptom distress in older or seriously ill prisoners; a more scientific development of compassionate release policies; and a broader inclusion of prisoners in national health datasets and in clinical research. I have developed new methods for responding to the unique health needs of criminal justice-involved older adults—including an evidence-based approach to reforming compassionate release policies and the design of a new tool to assess physical functioning in older prisoners. I was previously a consultant for the California Department of Corrections and Rehabilitation, as well as for other state prison systems.

3.      I have extensive experience working with vulnerable populations, in particular the incarcerated and the elderly.

Exhibit B

4.      I submit this affidavit in support of any defendant seeking release from custody during the COVID-19 pandemic, so long as such release does not jeopardize public safety and the inmate can be released to a residence in which the inmate can comply with CDC social distancing guidelines.  The statements in this affidavit are based only on the current state of emergency and the circumstances described below.

**The Risk of Infection and Accelerated Transmission of COVID-19 within Jails and Prisons is Extraordinarily High.**

5.      Prisons and jails are not actually isolated from our communities: hundreds of thousands of correctional officers and correctional healthcare workers enter these facilities every day, returning to their families and to our communities at the end of their shifts, bringing back and forth to their families and neighbors and to incarcerated patients any exposures they have had during the day.  Access to testing for correctional staff has been "extremely limited," guards have reported a "short supply" of protective equipment, and prisons are not routinely or consistently screening correctional officers for symptoms.[1]

6.      The risk of exposure is particularly acute in pre-trial facilities where the inmate populations shift frequently.[2]  For example, despite the federal government's guidance to stay

---

[1] Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests: How the U.S. Is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020), https://www.vice.com/en_ca/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits.

*See also* Daniel A. Gross, *"It Spreads Like Wildfire": The Coronavirus Comes to New York's Prisons*, The New Yorker (Mar. 24, 2020), https://www.newyorker.com/news/news-desk/it-spreads-like-wildfire-covid-19-comes-to-new-yorks-prisons; Josiah Bates, *'We Feel Like All of Us Are Gonna Get Corona.' Anticipating COVID-19 Outbreaks, Rikers Island Offers Warning for U.S. Jails, Prisons*, Time (Mar. 24, 2020), https://time.com/5808020/rikers-island-coronavirus/; Sadie, Gurman, *Bureau of Prisons Imposes 14-Day Quarantine to Contain Coronavirus*, WSJ (Mar. 24, 2020), https://www.wsj.com/articles/bureau-of-prisons-imposes-14-day-quarantine-to-contain-coronavirus-11585093075; Cassidy McDonald, *Federal Prison Workers Say Conflictings Orders on Coronavirus Response Is Putting Lives at Risk*, CBS News (Mar. 19, 2020), https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/.

[2] Emma Grey Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*, Wired (Mar. 24, 2020), https://www.wired.com/story/coronavirus-covid-19-jails-prisons/.

inside and many states' stay-in-place orders, many prosecutors are still arresting individuals and seeking detention.[3]   Pre-trial detention facilities are still accepting new inmates who are coming from communities where COVID-19 infection is rampant.   As of today's date, the Bureau of Prisons is still moving inmates from facility to facility, including prisoners in New York.[4]

7.   Because inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of COVID-19 within jails and prisons.   Inmates share small cells, eat together and use the same bathrooms and sinks.   They eat together at small tables that are cleaned only irregularly.   Some are not given tissues or sufficient hygiene supplies.[5]   Effective social distancing in most facilities is virtually impossible, and crowding problems are often compounded by inadequate sanitation, such as a lack of hand sanitizer or sufficient opportunities to wash hands.[6]

**Inmate Populations Also Have the Highest Risk of Acute Illness and Poor Health Outcomes if Infected with COVID-19.**

8.   There are more than 2.3 million people incarcerated in the United States[7]

---

[3] Stephen Rex Brown, *'Business as Usual' For Federal Prosecutors Despite Coronavirus, Nadler Writes, Calling for Release of Inmates*, N.Y. Daily News (Mar. 20, 2020), https://www.nydailynews.com/new-york/ny-nadler-doj-inmates-20200320-d6hbdjcuj5aitppi3ui2xz7tjy-story.html.

[4] Courtney Bublé, *Lawmakers, Union Urge Halt to All Prison Inmate Transfers*, Government Executive (Mar. 25, 2020), https://www.govexec.com/management/2020/03/lawmakers-union-urge-halt-all-prison-inmate-transfers/164104/; Hamilton, *Sick Staff, Inmate Transfers*; Luke Barr, *Despite Coronavirus Warnings, Federal Bureau of Prisons Still Transporting Inmates*, ABC News (Mar. 23, 2020),https://abcnews.go.com/Health/warnings-bureau-prisons-transporting-inmates-sources/story?id=69747416.

[5] Justine van der Leun, *The Incarcerated Person Who Knows How Bad It Can Get*, Medium (Mar. 19, 2020), https://gen.medium.com/what-its-like-to-be-in-prison-during-the-coronavirus-pandemic-1e770d0ca3c5 ("If you don't have money, you don't have soap or tissues."); Keri Blakinger and Beth Schwartzapfel, *How Can Prisons Contain Coronavirus When Purrell Is a Contraband?*, ABA Journal (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

[6] Rosa Schwartzburg, *'The Only Plan the Prison Has Is to Leave Us To Die in Our Beds'*, The Nation (Mar. 25, 2020), https://www.thenation.com/article/society/coronavirus-jails-mdc/.

[7] Kimberly Kindy *et al.*, *'Disaster Waiting to Happen': Thousands of Inmates Released as Jails and Prisons Face Coronavirus Threat*, Washington Post (Mar. 25, 2020), https://www.washingtonpost.com/national/disaster-waiting-to-happen-thousands-of-inmates-released-as-jails-face-coronavirus-threat/2020/03/24/761c2d84-6b8c-11ea-b313-df458622c2cc_story.html.

approximately 16% of whom are age 50 or older.[8] The risk of coronavirus to incarcerated seniors is high. "Their advanced age, coupled with the challenges of practicing even the most basic disease prevention measures in prison, is a potentially lethal combination."[9] To make matters worse, correctional facilities are often ill-equipped to care for aging prisoners, who are more likely to suffer from chronic health conditions than the general public.

9.     An estimated 39-43% of all prisoners, and over 70% of older prisoners, have at least one chronic condition, some of the most common of which are diabetes, hypertension, and heart problems.[10] According to the CDC, each of these conditions—as well as chronic bronchitis, emphysema, heart failure, blood disorders, chronic kidney disease, chronic liver disease, any condition or treatment that weakens the immune response, current or recent pregnancy in the last two weeks, inherited metabolic disorders and mitochondrial disorders, heart disease, lung disease, and certain neurological and neurologic and neurodevelopment conditions[11]—puts them at a "high-risk for severe illness from COVID-19."[12]

---

[8] Brie Williams *et al.*, *Strategies to Optimize the Use of Compassionate Release from US Prisons*, 110 AJPH S1, S28 (2020), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305434; Kimberly A. Skarupski, *The Health of America's Aging Prison Population*, 40 Epidemiologic Rev. 157, 157 (2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5982810/.

[9] Weihua Li and Nicole Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*, The Marshall Project (Mar. 19, 2020), https://www.themarshallproject.org/2020/03/19/this-chart-shows-why-the-prison-population-is-so-vulnerable-to-covid-19.

[10] Brie A. Williams *et al.*, *How Health Care Reform Can Transform the Health of Criminal Justice-Involved Individuals*, 33 Health Affairs 462-67 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4034754/; Brie A. Williams *et al.*, *Coming Home: Health Status and Homelessness Risk of Older Pre-release Prisoners*, 25 J. Gen. Internal Med. 1038-44 (2010), *available at* https://link.springer.com/content/pdf/10.1007/s11606-010-1416-8.pdf; Laura M. Maruschak *et al.*, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, U.S. Dept of Justice (Oct. 4, 2016), at 5, *available at* https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[11] Harvard Health Publishing, *Coronavirus Research Center*, Harvard Medical School (Mar. 25, 2020), https://www.health.harvard.edu/diseases-and-conditions/coronavirus-resource-center.

[12] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: People Who Are at Higher Risk*, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html (last updated Mar. 22, 2020).

10.     However, even many young federal prisoners suffer from asthma, rendering them also very vulnerable to coronavirus.[13]

11.     But it is not only the elderly, or those with preexisting medical conditions that are at risk of coronavirus in a correctional setting.  As of March 23, 2020, New York City reported that "[p]eople ranging in ages from 18 to 44 have accounted for 46 percent of positive tests."[14] Across the United States, 38% of those hospitalized are between the ages of 20 and 54 and 12% of the intensive care patients are between 20 and 44.[15]

12.     This data is of particular concern for inmate populations, since prisoners' physiological age *averages 10 to 15 years older* than their chronological age.[16]  Therefore, the consensus of those who study correctional health is that inmates are considered "geriatric, by the age of 50 or 55 years."[17]  It is not clear that prison health care administrations are taking accelerated ageing into account when determining the eligibility criteria for age-related screening tools and medical care protocols for coronavirus, potentially leaving large swathes of the prison population at risk.[18]

---

[13] Laura Maruschak, *Medical Problems of Jail Inmates*, Dep't of Justice (Nov. 2006), at p. 2, *available at* https://www.bjs.gov/content/pub/pdf/mpji.pdf.

[14] Kimiko de Freytas-Tamura, *20-Somethings Now Realizing That They Can Get Coronavirus, Too*, N.Y. Times (Mar. 23, 2020), https://www.nytimes.com/2020/03/23/nyregion/nyc-coronavirus-young.html.

[15] *Id.*

[16] Brie A. Williams *et al.*, *Aging in Correctional Custody: Setting a Policy Agenda for Older Prisoner Health Care*, 102 Am. J. Public Health 1475-81 (2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3464842/; *see also* Brie Williams *et al.*, *Detained and Distressed: Persistent Distressing Symptoms in a Population of Older Jail Inmates*, 64 J. Am. Geriatrics Soc. 2349-55 (2016), https://onlinelibrary.wiley.com/doi/pdf/10.1111/jgs.14310 ("For example, older jail inmates with an average age of 60 in this study reported poor or fair health [and] chronic lung disease . . . at rates similar to those reported by community-based lower income older adults with an average age of 72.").

[17] Brie A. Williams *et al.*, *The Older Prisoner and Complex Chronic Medical Care* 165-70 in World Health Organization, *Prisons and Health* (2014), https://pdfs.semanticscholar.org/64aa/10d3cff6800ed42dd152fcf4e13440b6f139.pdf.

13.     In one study, we found that inmates who died in hospitals were, on average, nearly two decades younger than non-incarcerated decedents, had significantly shorter hospitalizations, and had higher rates of several chronic conditions including cancer, liver disease and/or hepatitis, mental health conditions, and HIV/AIDS."[19]

**The Entire Community is at Risk If Prison Populations Are Not Reduced**

14.     As the World Health Organization has warned, prisons around the world can expect "huge mortality rates" from Covid-19 unless they take immediate action including screening for the disease.[20]

15.     As of March 24, 2020, at least 38 people involved in the New York City correctional system have tested positive for Covid-19.[21]  Already, three inmates and three staff at federal correctional facilities across the United States have tested positive for the coronavirus, according to the Federal Bureau of Prisons.[22]

16.     Jails and prisons are fundamentally ill-equipped to handle a pandemic.

17.     Medical treatment capacity is not at the same level in a correctional setting as it is in a hospital.  Some correctional facilities have no formal medical ward and no place to quarantine

---

[18] Brie A. Williams *et al.*, *Differences Between Incarcerated and Non-Incarcerated Patients Who Die in Community Hospitals Highlight the Need For Palliative Care Services For Seriously Ill Prisoners in Correctional Facilities and in Community Hospitals: a Cross-Sectional Study*, 32 J. Pallitive Med. 17-22 (2018), *available at* https://journals.sagepub.com/doi/pdf/10.1177/0269216317731547.

[19] *Id.* at 20.

[20] Hannah Summers, *'Everyone Will Be Contaminated'*: *Prisons Face Strict Coronavirus Controls*, The Guardian (Mar. 23, 2020), https://www.theguardian.com/global-development/2020/mar/23/everyone-will-be-contaminated-prisons-face-strict-coronavirus-controls.

[21] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons.*

[22] Ryan Lucas, *As COVID-19 Spreads, Calls Grow to Protect Inmates in Federal Prisons*, NPR (Mar. 24, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/24/820618140/as-covid-19-spreads-calls-grow-to-protect-inmates-in-federal-prisons.

sick inmates, other than the facilities' Special Housing Unit (SHU).[23]  While the cells in the SHU have solid doors to minimize the threat of viral spread in otherwise overcrowded facilities, they rarely have intercoms or other ways for sick inmates to contact officers in an emergency.[24]  This is particularly dangerous for those with COVID-19 infection since many patients with COVID-19 descend suddenly and rapidly into respiratory distress.[25]

18.     Even those facilities that do have healthcare centers can only treat relatively mild types of respiratory problems for a very limited number of people.[26]  This means that people who become seriously ill while in prisons and jails will be transferred to community hospitals for care. At present, access to palliative care in prison is also limited.

19.     Corrections officers may also be particularly vulnerable to coronavirus due to documented high rates of diabetes and heart disease.[27]  Prison staff in Pennsylvania, Michigan, New York and Washington state have tested positive for the virus, resulting in inmate quarantines. In Washington, D.C., a U.S. marshal who works in proximity to new arrestees tested positive for the virus, meaning dozens of defendants headed for jail could have been exposed.[28]  In New York,

---

[23] MCC New York COVID 19 Policy Memo, Mar. 19, 2020, https://www.documentcloud.org/documents/6818073-MCC-New-York-COVID-19-Policy-Memo.html; Danielle Ivory, *'We are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirus-prisons-jails.html.

[24] Brie Williams *et al.*, *Correctional Facilities in the Shadow of COVID-19: Unique Challenges and Proposed Solutions*, Health Affairs (Mar. 26, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/.

[25] Lizzie Presser, *A Medical Worker Describes Terrifying Lung Failure From COVID-19–Even in His Young Patients*, ProPublica (Mar. 21, 2020), https://www.propublica.org/article/a-medical-worker-describes--terrifying-lung-failure-from-covid19-even-in-his-young-patients.

[26] Ellis, *Covid-19 Poses a Heightened Threat in Jails and Prisons*; Li and Lewis, *This Chart Shows Why the Prison Population is So Vulnerable to COVID-19*.

[27] Brie Williams, *Role of US-Norway Exchange in Placing Health and Well-Being at the Center of US Prison Reform*, https://ajph.aphapublications.org/doi/10.2105/AJPH.2019.305444 (published Jan. 22, 2020).

[28] Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, WSJ (Mar. 22, 2020), https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600 ("We're all headed for some dire consequences," said Daniel Vasquez, a former warden of San Quentin and Soledad state prisons in

7

236 members of the New York Police Department have tested positive for coronavirus and 3,200 employees are sick, triple the normal sick rate.[29]  Two federal prison staffers have also tested positive.[30]

20.     For this reason, correctional health is public health. Decreasing risk in prisons and jails decreases risk to our communities.

21.     Reducing the overall population within correctional facilities will also help medical professionals spread their clinical care services throughout the remaining population more efficiently.  With a smaller population to manage and care for, healthcare and correctional leadership will be better able to institute shelter in place and quarantine protocols for those who remain. This will serve to protect the health of both inmates as well as correctional and healthcare staff.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: San Francisco, California
           March 27, 2020

_____
Dr. Brie Williams

---

California. "They're in such close quarters—some double- and triple-celled—I think it's going to be impossible to stop it from spreading.").

[29] Erin Durkin, *Thousands of NYPD Officers Out Sick Amid Coronavirus Crisis*, Politico (Mar. 25, 2020), https://www.politico.com/states/new-york/albany/story/2020/03/25/thousands-of-nypd-officers-out-sick-amid-coronavirus-crisis-1268960.

[30] Elinson and Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*.

WHEREFORE, for the above-stated reasons, and under these legal authorities, Waldron Prays this Honorable Court will grant this motion and provide the relief now sought.

Executed, subscribed, and sworn to under penalty of perjury pursuant to 28 U.S.C. § 1746, on this 16th day of April, 2020.

Respectfully submitted,

CURTIS WALDRON
Reg. No. 14280-067
Federal Correctional Complex
F.C.I. - Low
P.O. Box 26020
Beaumont, Texas 77720-2602

(6)

AFSM 6 N Hou 773
FRI 01 MAY 2020 PM

Federal C
Curtis h......
P.O. Box 26020
Beaumont, Tx 27720-2602

(U.S. District Clerk)
U.S. District Court
228 Walnut Street
Harrisburg, PA
17108